EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Annette Camacho Rivera, *et. al.* Peticionarios v. Richard Mitchell, Inc., *et. al.* Recurridos | 2019 TSPR 54 202 DPR ____ Certiorari |

Número del Caso: AC-2015-93

Fecha: 27 de marzo de 2019

Tribunal de Apelaciones:

      Región Judicial de San Juan, Panel III

Abogado de la parte peticionaria:

      Lcdo. Ramón Díaz Gómez

Abogados de la parte recurrida:

      Lcdo. Miguel Sagardía De Jesús
      Lcdo. José J. Lamas Rivera

Materia: Sentencia con Opinión de Conformidad y Opinión Disidente

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Annette Camacho Rivera,
*et al.*

   Peticionarios

      v.               AC-2015-0093    Certiorari

Richard Mitchell, Inc.,
*et al.*

   Recurridos

SENTENCIA

San Juan, Puerto Rico, a 27 de marzo de 2019.

     Examinado el recurso presentado por los peticionarios, se dicta Sentencia mediante la cual se revoca la Sentencia del Tribunal de Apelaciones emitida el 30 de junio de 2015 y notificada el 9 de julio de 2015.

     Notifíquese **inmediatamente.**

     Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo.

     El Juez Asociado señor Estrella Martínez emitió una Opinión de Conformidad, a la cual se unieron la Jueza Asociada señora Pabón Charneco y los jueces asociados señores Kolthoff Caraballo y Rivera García. El Juez Asociado señor Colón Peréz emitió una Opinión Disidente, a la cual se unieron la Jueza Presidenta Oronoz Rodríguez y los Jueces Asociados señores Martínez Torres y Feliberti Cintrón.

                      José Ignacio Campos Pérez
                    Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Annette Camacho Rivera, *et al.* | | | |
|---|---|---|---|
| Peticionarios | | | |
| v. | | AC-2015-0093 | Certiorari |
| Richard Mitchell, Inc., *et al.* | | | |
| Recurridos | | | |

Opinión de conformidad emitida por el Juez Asociado señor Estrella Martínez, a la cual se unen la Jueza Asociada señora Pabón Charneco, el Juez Asociado señor Kolthoff Caraballo y el Juez Asociado señor Rivera García.

San Juan, Puerto Rico, a 27 de marzo de 2019.

Estoy conforme con la determinación que hoy emite este Tribunal. Sin embargo, el presente caso nos brinda la oportunidad para aclarar los contornos de la responsabilidad civil extracontractual de los comerciantes, por los actos criminales de un tercero contra un cliente, en el contexto de clubes de entretenimiento nocturnos y discotecas. Ello, bajo el marco del Artículo 1802 del Código Civil de Puerto Rico, infra. En consecuencia, entiendo apropiado abundar sobre la norma pautada en J.A.D.M. v. Centro Com. Plaza Carolina, infra, y auscultar si la misma requiere que se prueben, como elemento indispensable, actos delictivos previos en el área cercana al comercio donde ocurre un acto criminal que provoca cierto daño.

Con ello en mente, procedo a puntualizar el contexto fáctico procesal en el cual se desarrolla la controversia ante nos.

I

El caso de epígrafe tuvo su génesis el 29 de septiembre de 2008, cuando el joven Félix Daniel Cotto Camacho (joven Cotto Camacho) fue asesinado, por otro cliente que le disparó a la cabeza, en el interior del Club Lazer.

A raíz de ello, el 4 de marzo de 2009, la madre del joven Cotto Camacho, la Sra. Annette Camacho Rivera (señora Camacho Rivera o peticionaria), entabló una demanda, por sí y en representación de sus hijos menores de edad, contra el referido negocio y su respectiva aseguradora. En ella, la señora Camacho Rivera reclamó una indemnización por los daños sufridos, por consecuencia de las angustias mentales que ésta y sus hijos sufrieron por la muerte del joven Cotto Camacho. A su vez, como causa heredada, reclamó los sufrimientos del fenecido. Fundamentó la demanda en que el Club Lazer fue negligente al no tomar las medidas preventivas necesarias para evitar que personas con armas de fuego entraran al local y la utilizaran para ultimar a otra persona, según sucedió en el presente caso.

En su contestación, el Club Lazer se limitó a alegar que carecía de responsabilidad civil, pues no había nexo causal. Asimismo, planteó que, como comerciante y tomando en consideración la naturaleza de su comercio, fue diligente en proveer a sus visitantes la seguridad y protección necesaria.

De esa forma, el 14 de noviembre de 2011, se celebró el juicio en su fondo, en el cual la parte demandante presentó

como testigos a los jóvenes Jorge Navarro Pizarro (joven Navarro Pizarro),[1] Jean C. Barada Santiago (joven Barada Santiago), Giovanny Rosa Báez (joven Rosa Báez)[2] y a Kevin G. López Carrasquillo (joven López Carrasquillo). A tales efectos, los testigos antes mencionados declararon sobre los hechos ocurridos durante la noche en la cual el joven Cotto Camacho fue asesinado.

En lo pertinente a la controversia ante nos, el joven Navarro Pizarro declaró que esa noche visitó el Club Lazer por quinta vez; que en la entrada de la discoteca las personas encargadas de la seguridad le efectuaron un registro manual únicamente desde el área de la cintura hasta los tobillos; que entró a la discoteca a pesar de poseer sustancias controladas; que consumió las mismas en el área VIP de la discoteca, y que le fueron vendidas bebidas alcohólicas, a pesar de éste ser menor de edad al momento de los hechos.[3]

Por su parte, el joven Barada Santiago declaró que era la quinta o sexta vez que asistía al Club Lazer; que fue registrado manualmente por las personas encargadas de la seguridad del local únicamente en los bolsillos y en los zapatos, y con un detector de metal en el área de la

---

[1] Para la fecha de los hechos, el joven Jorge Navarro Pizarro contaba con diecisiete años de edad. Sentencia, Apéndice de la Apelación, pág. 574.

[2] Para la fecha de los hechos, el joven Giovanny Rosa Báez contaba con dieciséis años de edad. Íd.

[3] Íd., págs. 574-575 y 745.

cintura; que al entrar a la discoteca y subir las escaleras se percató que se había formado una pelea, distinta al evento en que fue asesinado el joven Cotto Camacho, y que, previo a esa pelea, no habían personas encargadas de la seguridad en el área VIP, pero que éstas llegaron luego de ese altercado.[4]

Luego el joven Rosa Báez procedió a declarar. Éste testificó que para el momento de los hechos sólo tenía unos dieciséis años de edad; que no era la primera vez que había asistido a esa discoteca; que cuando entró al lugar, fue directo a la barra para comprar bebidas alcohólicas; que logró comprar y beber tantas bebidas alcohólicas en el local que vomitó por el exceso de éstas, y que sólo recordaba ver personas encargadas de la seguridad en la entrada del Club Lazer, mas no en algún otro lado.[5] Por último, testificó el joven López Carrasquillo. En lo concerniente al registro, éste declaró que en la entrada de la discoteca sólo le registraron la cintura de forma manual, sin el uso de un detector de metal.[6]

Culminado el desfile de la prueba por parte de la señora Camacho Rivera, el 15 de noviembre de 2011, el foro primario desestimó la demanda, por entender que la peticionaria no presentó prueba suficiente para probar su caso. Inconforme, la señora Camacho Rivera apeló la

---

[4]Íd., págs. 576-577 y 745.

[5]Íd., págs. 382, 577-578 y 745.

[6]Íd., págs. 382 y 578

referida determinación ante el Tribunal de Apelaciones. Ese

foro, el 31 de mayo de 2012, dictó sentencia en la cual

revocó la determinación del Tribunal de Primera Instancia,

no sin antes concluir lo siguiente:

> En el caso de autos, el daño ocasionado era previsible y evitable de haberse realizado a tiempo la acción omitida, en este caso, el registro adecuado de las personas antes de entrar al Club Lazer. [Éste] fue negligente al permitir que entraran personas armadas al Club Lazer. Así, incumplió con su deber legal de mantener unas condiciones de seguridad razonables en su establecimiento y de prever que el permitir que entraran personas con armas de fuego acarreaba un alto potencial de que se les pudiera causar daños a los clientes allí presentes, como ocurrió en el caso de autos.
>
> Por lo dicho, concluimos que el Club Lazer propició o facilitó con un registro descuidado y negligente que entrara, al menos, una persona con un arma de fuego al lugar; permitió que se consumiera alcohol en exceso, incluso por menores de edad, hasta provocarles vómito; y que se utilizaran sustancias controladas en el lugar que, mezcladas con alcohol, podían alterar la conducta o comportamiento de los parroquianos. Lazer debió conocer lo que ocurría en su local respecto a la venta de alcohol a menores de edad y el uso de drogas . . . . Ese ambiente permisivo pudo propiciar las condiciones que degeneraron en una pelea entre parroquianos, en medio de la cual uno de ellos sacó el arma de fuego que introdujo al local, luego de burlar la vigilancia de la entrada, y mató al hijo y hermano de los apelantes.
>
> En fin, resolvemos que esa combinación de factores descritos, probados en el juicio o, al menos, no refutados de manera preponderante por la parte apelada, constituían un cóctel explosivo y peligroso para los presentes en cualquier lugar. El cotejo de metales o armas de fuego negligente, el estipendio de alcohol a clientes menores de edad, generalmente inmaduros y con temperamento volátil, más la anuencia o permisión de los encargados respecto al uso de sustancias controladas por los parroquianos, pudieron contribuir a la causa adecuada de la muerte del joven Félix Daniel Cotto Camacho.
>
> Si el Club Lazer hubiese realizado una inspección adecuada de sus clientes, antes de

estos entrar a la discoteca, hubiese evitado el daño ocurrido en este caso, es decir, que una persona armada entrara y disparara contra otra, en este caso, el joven Félix Daniel.

Concluimos, pues, que de la prueba que tuvo ante sí el Tribunal de Primera Instancia, ese foro podía hacer una inferencia razonable de negligencia por parte del Club Lazer, sobre todo al no hacer un registro efectivo de las personas que asistían a ese Club, y resolver que esa omisión contribuyó a la ocurrencia de la muerte del joven Félix Daniel. Al desestimar el caso por insuficiencia de la prueba, resolvemos que el Tribunal de Primera Instancia erró en la aplicación del derecho a la prueba que tuvo ante sí.[7]

Consecuentemente, el Club Lazer solicitó reconsideración, con tal de que se le permitiera presentar evidencia a su favor. Ante esa solicitud, el 29 de junio de 2012, el Tribunal de Apelaciones enmendó sus expresiones a esos particulares. Devuelto el caso al Tribunal de Primera Instancia, éstos intentaron presentar como única prueba a su favor, el testimonio de la Sra. Karl Haakensen (señora Haakensen), gerente del Club Lazer al momento de los hechos. No obstante, al no dar con el paradero de ésta, intentaron sustituir su testimonio por una deposición. A esos efectos, le solicitaron al foro primario que se considerara como testigo no disponible a la señora Haakensen. La referida solicitud fue declarada sin lugar, puesto que, como se desprende del expediente, las gestiones realizadas por los recurridos fueron insuficientes.

Así las cosas, el 19 de agosto de 2014 el foro primario dictó sentencia en la cual declaró con lugar la demanda

---

[7]Íd., págs. 388-389.

presentada. Por consiguiente, concedió una indemnización de $75,000 a la señora Camacho Rivera y $25,000 a cada hijo de ésta por los sufrimientos causados por el asesinato del joven Cotto Camacho dentro del Club Lazer.

Inconformes con ese proceder, ambas partes recurrieron al Tribunal de Apelaciones solicitando revisión de la sentencia emitida por el foro primario. En lo pertinente, la señora Camacho Rivera solicitó revisión en torno a las cuantías otorgadas y el Club Lazer en lo referente a que éste carecía de responsabilidad civil frente a la peticionaria, ya que no fue negligente en el manejo de su establecimiento. Consolidados ambos recursos, el foro apelativo intermedio revocó la sentencia recurrida al concluir que el Tribunal de Primera Instancia se basó en conclusiones de hechos especulativas; que los daños alegados no eran previsibles, y que la peticionaria no pasó prueba alguna sobre actos delictivos previos en el Club Lazer o áreas aledañas que tendieran a demostrar la previsibilidad de los daños.

Ante el proceder del Tribunal de Apelaciones, la señora Camacho Rivera acude ante nos, mediante recurso de apelación, y solicita la revocación de la sentencia. Sostiene que el mencionado foro judicial erró al determinar que el Club Lazer no fue negligente en el manejo de su comercio. Asimismo, arguye que la sentencia emitida, el 31 de mayo de 2012, por el foro apelativo intermedio constituye la ley del caso, por lo que no procede la

revocación de la determinación del Tribunal de Primera Instancia.

Expuesto el contexto fáctico y procesal de la controversia y contando con el beneficio de ambas partes, procedo a exponer el marco jurídico aplicable a la controversia ante nuestra consideración.

## II

### A.

Sabido es que, de ordinario, el Art. 1802 del Código Civil de Puerto Rico, 31 LPRA sec. 5141, funge como la base jurídica para determinar si el actor de cierta conducta que ocasione un daño responde por responsabilidad civil extracontractual. El precitado Artículo establece, en lo pertinente, que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado." Íd. A esos efectos, hemos sostenido que para que prospere una causa de acción en virtud del Art. 1802, supra, es necesario que concurran tres elementos, a saber: (1) un acto u omisión culposa o negligente; (2) relación causal entre el acto u omisión culposa o negligente y el daño siendo reclamado, y (3) un daño real. Nieves Díaz v. González Massas, 178 DPR 820, 843 (2010); López v. Porrata Doria, 169 DPR 135, 150 (2006).

En cuanto al primer elemento, hemos establecido que "el concepto de la culpa . . . es tan infinitamente amplio como la conducta de los seres humanos e incluye cualquier falta de una persona que produce un mal o un daño". López v.

Porrata Doria, supra, pág. 150. Asimismo, hemos sostenido que los conceptos de culpa y negligencia equivalen al incumplimiento con el deber de cuidado. Lo que a su vez concierne, en esencia, en no anticipar o prever las probables consecuencias de los actos, que hubieran sido previstas por una persona prudente y razonable. Nieves Díaz v. González Massas, supra, pág. 844; López v. Porrata Doria, supra, pág. 151; Valle v. E.L.A., 157 DPR 1, 18 (2002); Ramos v. Carlo, 85 DPR 353, 358 (1962). Lo anterior no exige imaginar de manera precisa la universalidad de consecuencias que pueden surgir por determinada conducta. Pons v. Engebretson, 160 DPR 347, 355 (2003). "Lo esencial es que exista un deber de prever, de forma general, las consecuencias de determinada clase". Íd. A tales efectos, hemos recurrido a la figura del buen padre de familia, o la persona prudente y razonable, para fines de determinar cómo debe obrar una persona de diligencia normal u ordinaria, en virtud de unas circunstancias particulares. Nieves Díaz v. González Massas, supra, pág. 844; López v. Porrata Doria, supra, págs. 150-151.

Por tanto, si el daño causado era previsible, habrá responsabilidad; si no lo era, se considerará un evento fortuito. Pons v. Engebretson, supra. Ahora bien, también hemos indicado que el deber de cuidado y de prever los posibles daños no se extiende a cualquier peligro imaginable que pueda ocasionar un perjuicio, sino que más bien debe estar basado en probabilidades, no en meras

posibilidades. López v. Porrata Doria, supra, págs. 164-165.

Por otro lado, el segundo elemento requiere que entre el daño causado y el acto u omisión culposa o negligente haya un nexo causal, entiéndase, causa adecuada. La teoría de la causalidad adecuada dispone que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". Colón Santos v. Coop. Seg. Mult. P.R., 173 DPR 170, 186 (2008). Es decir, "un daño podrá ser considerado como el resultado probable y natural de un acto u omisión negligente si luego del suceso, al mirarlo retrospectivamente, el daño parece ser la consecuencia razonable y común de la acción u omisión". Pons v. Engebretson, supra, págs. 355-356; Hernández Vélez v. Televicentro, 168 DPR 803, 815 (2006). A esos efectos, hemos sostenido que "[l]a doctrina de la causalidad adecuada requiere de índices o criterios fundados en la **experiencia y el conocimiento de causas y efectos** para darle contenido". (Énfasis suplido). López v. Porrata Doria, supra, págs. 166-67.

Por último, para que prospere una causa de acción en nuestro ordenamiento jurídico es necesario que, efectivamente, ocurra un daño. Éste, para fines extracontractuales, se refiere a "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra". J. Puig

Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, 1983, T. 2, Vol. 3, pág. 92. Véase, además, Sagardía De Jesús v. Hosp. Aux. Mutuo., 177 DPR 484, 505 (2009). Por lo tanto, ante la inexistencia de un daño, no existe la obligación de indemnizar. López v. Porrata Doria, supra, pág. 151.

**B.**

Lo anterior cobra mayor relevancia en el contexto de establecimientos comerciales. Es norma reiterada que cuando un comerciante mantiene abierto al público un lugar, con el propósito de llevar a cabo actividades económicas para su beneficio, éste asume el deber de mantener ese espacio en condiciones óptimas de seguridad que evite que un cliente sufra daño alguno. Colón y otros v. K-mart y otros, 154 DPR 510, 518 (2001). En cuanto a ese deber, hemos resaltado que el mismo "implica que el dueño u operador **debe de ejercer un cuidado razonable para mantener la seguridad de las áreas accesibles al público, para que, de ese modo, se evite que sus clientes sufran algún daño**". (Énfasis suplido). Íd. De igual forma, "los propietarios de establecimientos comerciales son responsables por los daños ocasionados a causa de aquellas **condiciones peligrosas existentes**, siempre que éstas sean conocidas por los propietarios o su conocimiento le sea imputable". (Énfasis suplido). Íd. Lo anterior no implica que el dueño de un establecimiento comercial asuma responsabilidad absoluta frente a cualquier daño recibido por un cliente dentro de

su negocio. Íd. Por lo tanto, la persona que haya sufrido un daño en un establecimiento comercial debe probar que ese daño "se debió a la existencia de una condición peligrosa, que esa condición fue *la que con mayor probabilidad ocasionó el daño* y que ésta era conocida por el demandado, o que **debió conocerla**". (Énfasis suplido). Íd., pág. 519. Es decir, la persona no tiene que saber necesariamente de la condición peligrosa, sino que basta con que ésta debió conocerse. Claro está, su desconocimiento no puede ser producto de la falta de diligencia.

### C.

Por otra parte, en J.A.D.M. v. Centro Com. Plaza Carolina, 132 DPR 785 (1993), analizamos los contornos sobre en cuáles instancias responde un comerciante por los actos criminales de un tercero contra un cliente. En primer término, expusimos que "aunque como regla general no existe un deber de proteger a otros de actos criminales de terceros, existen situaciones en que responde un demandado por los actos delictivos de un tercero contra el demandante". Íd., pág. 797. En ese sentido, las controversias que surjan a la luz de lo anterior se evaluarán conforme a las doctrinas de negligencia y la previsibilidad del riesgo. Íd. Además, en lo pertinente a la controversia ante nos, establecimos que:

> [S]e puede colegir que para poder responsabilizar a un . . . [comercio] por los actos delictivos de un tercero cometidos contra un cliente en sus predios, debe haber un quebrantamiento del deber de proveer adecuada y razonable vigilancia. **Este deber se basa en la**

**naturaleza de la actividad llevada a cabo en un. . . [comercio] y en la previsibilidad de actos delictivos que depende, a su vez, del conocimiento de actos delictivos previos en el . . . [comercio] <u>o</u> de circunstancias que hagan que una persona prudente y razonable pueda anticipar la ocurrencia de tales actos.** El quebrantamiento de este deber dependerá de si las medidas tomadas fueron o no adecuadas. La adecuacidad de las medidas adoptadas a su vez dependerá, entre otras cosas, de: (1) la naturaleza del . . . [establecimiento comercial] y las actividades que allí se llevan a cabo; (2) la naturaleza de la actividad criminal que se esté registrando en el área del . . . [comercio], y (3) si las medidas de seguridad que se adopten son razonables y van dirigidas a minimizar la posibilidad de que los patrocinadores del . . . [establecimiento comercial] sufran daños causados por la actividad criminal intencional de terceros. (Énfasis y subrayado suplido) Íd., pág. 801.

Así, existen instancias particulares, las cuales desembocan en responsabilidad por parte del comerciante por los actos de un tercero. A tales efectos, hemos expresado que:

**[E]xisten ciertas actividades específicas que conllevan un deber especial de vigilancia, cuidado y protección de quien las lleve a cabo hacia el público en general o hacia ciertas personas en particular.** Esta responsabilidad, que genera un deber de cuidado mayor del exigible a una persona cualquiera, se fundamenta en las circunstancias de la situación — entiéndase, **el tiempo, el lugar y las personas**— y en las exigencias de la obligación particular en la que se sitúan los involucrados. (Énfasis suplido). <u>Administrador v. ANR</u>, 163 DPR 48, 60 (2004)

Como resultado, "habrá responsabilidad sólo si el demandado es negligente en no tomar precauciones contra el posible criminal; esto es, si el riesgo previsible es de dimensión irrazonable comparado con el peso de tomarlas". <u>Estremera v. Inmobiliaria Rac, Inc.</u>, 109 DPR 852, 858 esc.

6 (1980). Por lo tanto, la jurisprudencia interpretativa de lo anterior ha señalado que "la determinación de responsabilidad y de la adecuacidad de las medidas de seguridad tomadas dependerá de una **evaluación de la totalidad de las circunstancias**, caso a caso". (Énfasis suplido). Santiago v. Sup. Grande, 166 DPR 796, 812 (2006).

Cabe resaltar que la norma antes expuesta, según establecida por este Tribunal en J.A.D.M. v. Centro Com. Plaza Carolina, supra, y reafirmada en Santiago v. Sup. Grande, supra, fue adoptada mediante un examen de la jurisprudencia norteamericana sobre la responsabilidad por los actos delictivos de un tercero en un comercio. J.A.D.M. v. Centro Com. Plaza Carolina, supra, pág. 797. De ese modo, y 25 años después, resulta imperativo reexaminar la referida jurisprudencia, con tal de determinar si ésta continúa siendo la tendencia mayoritaria entre los estados de la Unión.

Luego de un análisis minucioso, resulta claro que la referida norma no ha sido alterada y que el examen correcto es aquel reafirmado, hace poco más de una década, en Santiago v. Sup. Grande, supra, en lo concerniente al análisis de la totalidad de las circunstancias.[8] En otras palabras, la ausencia de uno de

---

[8]Véanse, Stanton v. Univ. of Maine System, 773 A.2d 1045(Me. 2001); Flood v. Southland Corp., 739 N.E.2d 702, 704 (Mass. 2000); Tenney v. Atlantic Associates, 594 N.W.2d 11 (Iowa 1999); Looks Twice v. Whidby, 569 N.W.2d 459 (S.D. 1997); Clohesy v. Food Circus Supermarkets, Inc., 694 A.2d 1017 (N.J. 1997); Scialabba v. Brandise Const. Co., 921 P.2d 928 (Nev. 1996); Seibert v. Vic

los criterios a ser evaluados, para fines de determinar si imponer responsabilidad, no equivale a la desestimación de la acción, puesto que pueden haber, como en el caso de autos, ciertos hechos pertinentes y particulares que, evaluados a la luz de la totalidad de las circunstancias, conlleven a la imposición de responsabilidad al dueño del establecimiento comercial. Es decir, la falta de evidencia sobre la naturaleza de la actividad criminal que se esté registrando en el área del establecimiento es una, mas no la única circunstancia que debe tomar en consideración el juzgador de los hechos para determinar si el daño ocasionado era previsible. Después de todo, según establecido por la jurisprudencia, se trata de factores que pueden ser considerados por el juzgador, y no de requisitos taxativos de una causa de acción.

En fin, lo anterior en gran manera responde al análisis establecido por el Juez Learned Hand en el caso de United States v. Carroll Towing Co., 159 F.2d 169 (2do Cir. 1947). Éste estableció una fórmula para fines de determinar si una persona debe responder extracontractualmente como consecuencia de cierto acto u omisión que ésta lleva a cabo. Así, se deberá tomar en

---

Regnier Builders, Inc., 856 P.2d 1332 (Kan. 1993); Sharp v. W.H. Moore, Inc., 796 P.2d 506 (Idaho 1990); Jardel Co., Inc. v. Hughes, 523 A.2d 518 (Del. 1987); Taco Bell, Inc. v. Lannon, 744 P.2d 43 (Colo. 1987); Isaacs v. Huntington Memorial Hospital, 695 P.2d 653 (Cal. 1985); Early v. N.L.V. Casino Corp., 678 P.2d 683 (Nev. 1984); McFarlin v. Hall, 619 P.2d 729 (Ariz. 1980); Peters v. Holiday Inns, Inc., 278 N.W.2d 208 (Wis. 1979).

consideración la gravedad del daño, la probabilidad de ocurrencia y el costo que conlleva tomar las medidas para evitar el daño.[9] Dicho de otra forma, la norma antes expuesta establece que, si la probabilidad de la ocurrencia del daño multiplicado por la gravedad de éste es mayor al peso de evitar el mismo, resultará en la imposición de responsabilidad. United States v. Carroll Towing Co., supra, pág. 174.

## III

El caso de marras versa sobre el asesinato, por medio de un disparo a la cabeza, del joven Cotto Camacho dentro del Club Lazer. Como resultado de ese evento, la madre del joven Cotto Camacho presentó una demanda en el Tribunal de Primera Instancia en la cual reclamó una indemnización por los daños sufridos, a raíz de las angustias mentales que ésta y sus hijos sufrieron por la muerte del joven Cotto Camacho y, como causa heredada, reclamó los sufrimientos del fenecido. En ese pleito, la señora Camacho Rivera arguyó que el Club Lazer fue negligente al no tomar las medidas preventivas necesarias para evitar que personas con armas de fuego entraran al local y fueran utilizadas en el negocio para

---

[9] "(1) The probability that she will break away; (2) the gravity of the resulting injury, if she does; (3) the burden of adequate precautions. Possibly it serves to bring this notion into relief to state it in algebraic terms: if the probability be called P; the injury, L; and the burden, B; liability depends upon whether B is less than L multiplied by P: i.e., whether B less than PL." United States v. Carroll Towing Co., 159 F.2d 169, 173 (2do Cir. 1947).

ultimar a otra persona, según sucedió en el presente caso. Para sustentar su reclamo, la peticionaria presentó como prueba el testimonio de cuatro testigos, los cuales visitaron el Club Lazer junto al joven Cotto Camacho, la noche de los hechos. De esa forma, y en lo pertinente, estos testificaron cómo los registros efectuados por las personas encargadas de la seguridad del Club Lazer fueron inconsistentes, inadecuados y no uniformes; qué hicieron al entrar; sobre las deficiencias de seguridad dentro del local comercial, y sobre los actos delictivos que observaron dentro de éste. Aquilatada la prueba presentada ante el Tribunal de Primera Instancia, éste, inicialmente, declaró sin lugar la demanda interpuesta, la cual fue oportunamente apelada.

En revisión, el Tribunal de Apelaciones intermedio revocó la determinación del foro primario, puesto que concluyó que la señora Camacho Rivera, a la luz de la totalidad de las circunstancias, presentó la prueba que justificaba la concesión del remedio solicitado. Por consiguiente, devolvió el caso al Tribunal de Primera Instancia, con el propósito de que los recurridos presentaran prueba, si alguna, que estos tuviesen a su favor. A pesar de ello, no presentaron ningún tipo de prueba. Como resultado, el foro primario dictó sentencia, en la cual otorgó varias indemnizaciones a la peticionaria. Inconformes, los recurridos acudieron

nuevamente al foro apelativo intermedio, el cual revocó en su totalidad la sentencia recurrida y desestimó la acción instada por la señora Camacho Rivera. Ello, basado en que no presentó algún tipo de prueba respecto a la naturaleza de la actividad criminal que se había registrado en o cerca del Club Lazer, o incidente previo alguno de actividad criminal. Así las cosas, la peticionaria recurre ante nos con el fin de que resolvamos si la actuación del Tribunal de Apelaciones fue correcta, en virtud de la doctrina de ley del caso y la norma antes expuesta, y a los fines de que determináramos si a la luz de la totalidad de las circunstancias, los hechos probados justifican la concesión del remedio solicitado.

Examinada la controversia y el marco jurídico que aplica a la misma, resulta forzoso concluir que, a la luz de la totalidad de las circunstancias, los recurridos responden por la muerte del joven Cotto Camacho. **Ciertamente, en este tipo de establecimientos comerciales, de ordinario, la implementación de un cateo manual o con detectores de metales es suficiente.** Sin embargo, en este caso quedó claramente establecido que la medida de seguridad en cuestión no fue implementada razonablemente por el comercio. Por el contrario, según surge de los testimonios de los testigos de la peticionaria, las medidas de seguridad realizadas por el Club Lazer fueron implementadas de manera inadecuada.

Ello, puesto que los registros realizados en la entrada del establecimiento se efectuaron de forma defectuosa e inconsistente. Conforme a las declaraciones de los testigos, en ocasiones los empleados de seguridad de la discoteca registraban a las personas de la cintura para abajo y en otras de la cintura hacia arriba. Asimismo, a veces verificaban la cintura de las personas y en otras no, al igual que sus bolsillos. De igual modo, demostraron que, previo a ocurrir cierta pelea en la noche de los hechos, no existía seguridad adecuada dentro del establecimiento. Asimismo, surge de la prueba desfilada que el Club Lazer optó por utilizar también detectores de metal en la entrada de éste. No obstante, esa misma prueba demostró que, en este caso, los recurridos no implementaron adecuadamente el uso de éstos, ya que no lo utilizaban en cada persona que entraba al local. Tampoco registraban uniformemente a las personas, puesto que en ocasiones solo registraban la cintura y en otras ocasiones sólo lo utilizaban de la cintura hacia arriba.

En ese sentido, nótese que se trata de un establecimiento comercial que no proveyó las medidas de seguridad razonables y necesarias para evitar que entrara un arma de fuego a su local, la cual podría ser utilizada para matar, como ocurrió. La muerte del joven Cotto Camacho fue consecuencia de la omisión en proveer un registro razonablemente adecuado, consistente y

uniforme. De hecho, resulta claro que el Club Lazer fue negligente en la administración del área bajo su control, pues, entre otras cosas, ocurrían peleas entre sus clientes, las cuales no podían manejar.[10] A la luz de lo anterior, no cabe duda de que todos esos factores en conjunto son los que con alta probabilidad produjeron el daño en cuestión.

La existencia o inexistencia de incidentes delictivos previos no es requisito indispensable para determinar la previsibilidad de un daño, a los fines de resolver si una persona debe responder extracontractualmente por el acto criminal de un tercero dentro de su establecimiento comercial. Por el contrario, deben evaluarse la totalidad de las circunstancias. A esos efectos, el mero hecho de que no se haya pasado prueba respecto al elemento o criterio de la actividad criminal que existe cerca del Club Lazer, o incidentes previos algunos de actividad criminal, no es óbice para que, bajo otros hechos probados, y a la luz de la totalidad de las circunstancias, se pueda determinar que el daño ocurrido era previsible y que la negligencia de los recurridos al ejecutar el mecanismo de seguridad fue la causa adecuada del mismo. En otras palabras, la ausencia de prueba

---

[10]Además, según surge de la prueba que el Club Lazer permitía la entrada de menores edad; les vendía bebidas alcohólicas a estos; expedía bebidas alcohólicas sin tomar en consideración cuán embriagado estaba el cliente, al nivel de que un testigo indicó que vomitó en la discoteca por el exceso de consumo; toleraba el uso de sustancias controladas dentro del local; y no controlaba el perímetro adecuadamente.

sobre el aspecto antes mencionado no equivale automáticamente a la desestimación de la causa.

Adviértase, además, que existen ciertas actividades específicas que por su naturaleza acarrean un deber de previsibilidad de actos delictivos que emana de circunstancias, las cuales hagan que una persona prudente y razonable pueda anticipar la ocurrencia de tales actos. J.A.D.M. v. Centro Com. Plaza Carolina, supra. Como corolario de lo anterior, no es correcto aseverar que sea indispensable que, en todos los casos presentados contra comerciantes por actos delictivos de terceros, se pase prueba sobre actividad delictiva previa. Tampoco es necesario que, en efecto, hayan ocurrido actos criminales previamente. Ello debido a que existen ciertas actividades y circunstancias específicas que por su naturaleza hacen posible anticipar probables actos delictivos, los cuales traen consigo un deber especial de vigilancia, cuidado y protección de quien las lleve a cabo hacia el público en general. Administrador v. ANR, supra. Así, debemos notar que la exigencia de tomar medidas de vigilancia o de seguridad razonables surge cuando una persona prudente y razonable puede anticipar la ocurrencia de actos que pongan en peligro la seguridad de quienes visitan el establecimiento y éste puede evitarse con la ejecución de las referidas medidas. A su vez, al analizar la razonabilidad de las medidas de seguridad adoptadas por

el comercio se puede considerar, entre otras cosas, **la naturaleza del establecimiento comercial y las actividades que allí se llevan a cabo, así como el efecto que puede tener la adopción de estas medidas para minimizar la posibilidad de que se produzca el daño que se quiere evitar.** En consecuencia, no cabe duda de que, analizadas en conjunto la naturaleza del Club Lazer y las circunstancias específicas del caso, los recurridos podían anticipar que, el proveer un registro deficiente e inadecuado, inconsistente y no uniforme podía desembocar en un daño como el del presente caso.

No se debe perder de perspectiva que estamos ante un negocio que, por su naturaleza, haría que una persona prudente y razonable previera la ocurrencia de un daño como el presente. Ante ese cuadro, es de esperarse que ésta tomaría ciertas medidas de seguridad razonables, para evitar que entraran armas de fuego no autorizadas a su establecimiento, las cuales, previsiblemente, pueden utilizarse para asesinar a otra persona. En el caso de autos, tan previsible era el daño en cuestión que el Club Lazer estableció unos cateos en la entrada. No obstante, el fallo y negligencia de éste fue en su implementación. Por tal motivo, opino que el Club Lazer incumplió su deber de, como mínimo, asegurar que las medidas de seguridad implementadas fueran ejecutadas de manera uniforme, adecuada y razonable. Claro está, en el contexto de la controversia que nos ocupa, de haber

actuado e implementado las medidas conforme al estándar de cuidado aquí expuesto, el recurrido hubiera estado exento de responsabilidad civil. No obstante, ante sus omisiones, corresponde determinar que el Club Lazer responde frente a la señora Camacho Rivera.

Lo anterior cobra mayor relevancia cuando, a base del análisis pautado en United States v. Carroll Towing Co., supra, es diáfano que el costo de efectuar un registro adecuado, uniforme y consistente es ínfimo en comparación con el asesinato de la víctima. Incluso, cuando la probabilidad de que este suceso ocurra, como resultado de la omisión del Club Lazer en efectuar el referido registro, es considerablemente alta.

**IV**

Por los fundamentos antes expuestos, estoy conforme con revocar la sentencia del Tribunal de Apelaciones y

reinstalar en su totalidad la sentencia emitida por el Tribunal de Primera Instancia.


                              Luis F. Estrella Martínez
                                   *Juez Asociado*

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Annette Camacho Rivera, por sí
y en representación de sus
hijos menores de edad,
J.L.C.C; J.D.C.C.

     Apelantes

                              AC-2015-0093    Apelación

       v.

Richard Mitchell, Inc.;
h/n/c Club Lazer;
Universal Insurance Company

     Apelados

Opinión Disidente emitida por el Juez Asociado SEÑOR COLÓN PÉREZ a la cual se unen la Jueza Presidenta ORONOZ RODRÍGUEZ y los Jueces Asociados SEÑOR MARTÍNEZ TORRES y SEÑOR FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 27 de marzo de 2019.

Toda vez que el expediente ante nuestra consideración está **huérfano de prueba** que tienda a demostrar, como lo exige la normativa que gobierna estos asuntos, que (1) las actividades que se habían estado llevando a cabo en el Club Lazer previo a la noche de los hechos, (2) o la actividad criminal anterior en el local o en sus inmediaciones (3) exigieran un nivel de seguridad particular o en cualquier caso mayor al provisto la noche en que ocurrieron los sucesos que dieron margen al presente litigio, disentimos del curso de acción que hoy sigue una mayoría de este Tribunal.

I.

Los hechos que dieron origen a la controversia ante nuestra consideración ocurrieron en la madrugada del lunes, 29 de septiembre de 2008. En esa ocasión, el joven Félix Daniel Cotto Camacho (en adelante "el joven Cotto Camacho"), quien para ese entonces tenía 19 años de edad, acudió al Club Lazer ubicado en San Juan, Puerto Rico, y en el interior del local fue herido de bala. Dicho incidente, lamentablemente, le ocasionó la muerte.

Así las cosas, y por tales hechos, el 4 de marzo de 2009, la señora Annette Camacho Rivera (en adelante "señora Camacho Rivera"), madre del joven Cotto Camacho, por sí y en representación de sus hijos menores de edad, presentó una demanda en daños y perjuicios en contra del Club Lazer. **En la misma alegó que el Club Lazer fue negligente al no tomar las medidas de seguridad necesarias para evitar la entrada de personas armadas a sus predios, lo que ocasionó la muerte de su hijo, el joven Cotto Camacho.** Por ello, reclamó indemnización por la suma total de $1,600,000.00.

Oportunamente, el Club Lazer y su aseguradora, Universal Insurance Company, presentaron su contestación a la demanda. En ésta, en síntesis, negaron responsabilidad alguna, pues atribuyeron los hechos a actos criminales de terceros no susceptibles de previsión ni posibles de evitar. Asimismo, plantearon la inexistencia de nexo causal entre los daños alegados y sus actuaciones. En particular, plantearon que el Club Lazer fue diligente en garantizar a toda persona que le

visita, la protección, seguridad y vigilancia correspondiente.

Luego de varios trámites procesales no necesarios aquí pormenorizar, el 14 de noviembre de 2011, se llamó el caso para el juicio en su fondo. La prueba testifical presentada por la señora Camacho Rivera consistió en el testimonio de ésta y de cuatro (4) testigos que estuvieron presentes en el Club Lazer cuando ocurrieron los hechos, a saber: Jorge Navarro Pizarro, Jean Carlos Barada Santiago, Giovanny Rosa Báez y Kevin G. López Carrasquillo.

Así pues, el día del juicio, el joven Jorge Navarro Pizarro (en adelante "joven Navarro Pizarro"), a grandes rasgos, testificó que el 28 de septiembre de 2008 llegó a la discoteca Club Lazer alrededor de las once o doce de la noche, junto a los jóvenes Félix D. Cotto Camacho, Jean Carlos Barada Santiago, Gioavanni Rosa Báez y Kevin G. López Carrasquillo; que los "rebuscaron" de la cintura para abajo, que pagaron el dinero de la entrada, que fueron a la barra y que compró una bebida alcohólica sin que nadie interviniera con él. Expresó, además, que luego de comprar un trago se trasladó al área V.I.P., donde preparó y fumó un cigarro de marihuana. Finalmente, narró que entre las dos y tres de la madrugada ocurrió un altercado entre el joven Cotto Camacho y otro individuo, que culminó con el individuo asesinando al primero. Describió que el individuo le dio una "bofetá" al joven Camacho Cotto y que este último fue a defenderse y "le

tiró", entonces el individuo sacó un arma y "le entró y le dio los tiros".[11]

Durante el contrainterrogatorio, el joven Navarro Pizarro expresó que el día de los hechos salió a compartir con varios amigos a la discoteca Club Lazer; que se fueron desde Río Grande hacia San Juan en la guagua de un joven llamado Alexander Rivera Betancourt, junto a Giovanni Rosa Báez y un joven llamado Héctor. Testificó, además, que al llegar a la mencionada discoteca hizo una fila en la acera; que a la entrada del Club Lazer había guardias de seguridad que registraban a las personas que querían entrar al establecimiento; que las personas pagaban la entrada luego de haber sido registradas; que observó guardias de seguridad o "bouncers" en la entrada de la referida discoteca y también cuando entró a la misma, pero no recordó cuántos eran.[12] Además, expresó que cuando salió del establecimiento observó que había policías en la parte de afuera.[13] En el re-directo, el testigo describió que el registro fue "normal", con las manos y de la cadera para abajo.[14]

Por su parte, el joven Jean Carlos Barada Santiago (en adelante "el joven Barada Santiago"), en esencia, testificó que el 29 de septiembre de 2008 fue a la discoteca Club Lazer alrededor de las doce de la medianoche; que a él y a sus amigos les realizaron un registro; y que luego entró a la discoteca. Narró que cuando subió las escaleras, se había formado una pelea,

---

[11] Transcripción de la prueba oral (en adelante "TPO"), págs. 20-22.
[12] TPO págs. 22-25.
[13] TPO pág. 25.
[14] TPO págs. 25-26.

pero no era con ninguno de ellos; que se calmó un poco la cosa y él y sus amigos fueron a la barra y compraron tragos. Expresó también que, más adelante, mientras bailaba con una amiga, se formó una pelea, en la que un individuo agredió al joven Cotto Camacho, "los separaron, sacaron la pistola, y zumbaron par de tiros". El testigo señaló que él también resultó herido en el abdomen. Por último, sostuvo que vio el incidente, pero que no podía describir a la persona que tenía el arma de fuego e hizo las detonaciones. Sin embargo, sí pudo reconocer que era del sexo masculino.[15]

En cuanto al registro, el joven Barada Santiago indicó que lo registraron manualmente y que le tocaron la cintura. Declaró que no conocía bien al joven Cotto Camacho y que no tuvo interacción con éste en el Club Lazer, más allá de saludarse.[16]

En el contrainterrogatorio, el testigo expresó que hizo fila en la acera para entrar a la discoteca Club Lazer; que había personal de seguridad afuera; que cuando llegó a la puerta del establecimiento pasó por la supervisión de dos guardias de seguridad; que uno de los guardias de seguridad lo registró manualmente en la acera y que le revisaron los zapatos. Inicialmente, indicó que no le revisaron los bolsillos, pero luego de ser confrontado con una declaración previa que había realizado en un interrogatorio, éste recordó que sí le verificaron los bolsillos. Declaró que a las afueras del Club Lazer había

---

[15] TPO págs. 27-31.
[16] TPO págs. 31-32.

policías estatales en la esquina de la calle donde estaba el establecimiento, pero que no los observó cuando estaba en la fila; que esa noche hizo la fila V.I.P. y lo registraron; que uno de los guardias de seguridad le pasó el detector de metales por la cintura; que luego de ese registro fue que subió las escaleras y pagó la entrada; que le pidieron una identificación en la entrada.[17] Este testigo también expresó que había "bouncers" cuando se formó el incidente, pero no precisamente en el lugar donde ocurrieron los hechos, sino que llegaron allí después.[18]

En el re directo, el joven Barada Santiago testificó que lo registraron con las manos, que le tocaron los bolsillos y que le pasaron la paleta en la cintura, pero no en alguna otra parte del cuerpo.[19]

De otra parte, el testigo Giovanni Rosa Báez (en adelante "el joven Rosa Báez"), sostuvo, en síntesis, que la noche del 28 de septiembre de 2008 se dirigió, junto a unos amigos, al Club Lazer. Añadió que cuando llegaron al mencionado establecimiento había varias filas y ellos hicieron la fila V.I.P., que entraron a la discoteca y que caminaron directamente a la barra a comprar tragos. Declaró, además, que posteriormente fueron al área V.I.P. y estuvieron un rato; que fue al baño; que luego fueron de nuevo a comprar otros tragos y regresaron al área V.I.P.; que cuando llegó a esa área, vomitó por el exceso de alcohol y ahí escuchó las detonaciones. Relató también que observó a su primo, Jean Carlos Barada Santiago,

---

[17] TPO págs. 34-39.
[18] TPO págs. 39-40.
[19] TPO pág. 41.

salir corriendo del establecimiento y que todo el mundo estaba corriendo. Expresó que al salir del lugar no encontró a su primo ni a Alexander Rivera Betancourt por ningún lado. Entonces, acudió a un "bouncer" para ver si los podía localizar. Testificó que en ese momento se encontró con una persona que conocía y que estaba con su hermano. Se montó en el vehículo con ellos y así llegó a Río Grande.[20]

En el contrainterrogatorio, el joven Rosa Báez declaró que, el día de los hechos, salió de Río Grande con Jean Carlos Barada Santiago y Alexander Rivera Betancourt para la discoteca Club Lazer; que hicieron fila en la acera para entrar a la discoteca; que había guardias de seguridad en la entrada controlando la misma; que una vez entró, pagó y subió las escaleras, y que no vio guardias de seguridad en la parte de arriba. Sobre este asunto, lo confrontaron con una deposición previa en la que había testificado bajo juramento que había guardias de seguridad arriba, en el Club Lazer. Sin embargo, éste sostuvo que no recordaba que hubiese personal de seguridad arriba. No obstante, el testigo reconoció y expresó que el documento que le mostraron era una transcripción de las preguntas que le realizaron en la deposición. De otra parte, el testigo expresó que una vez salió a las afueras del establecimiento, luego del incidente, observó que había policías estatales.[21]

Por último, el testigo Kevin G. López Carrasquillo declaró que a él y sus amigos les rebuscaron la cintura

---

[20] *Íd*. págs. 43-48.
[21] TPO págs. 49-53.

con las manos, que no usaron el detector de metales y los dejaron pasar al Club; que cuando entraron, fueron a la barra y compraron bebidas alcohólicas; que se fueron al área V.I.P.; y que vio que allí estaba el joven Cotto Camacho, a quien describió como un muchacho al que le decían Willy "El Pollo".[22]

En el contrainterrogatorio, este testigo señaló que cuando llegó al Club Lazer había tres filas afuera y él hizo la fila del medio; que una vez llegó a la entrada lo registraron manualmente unos "bouncers" y que lo tocaron; que al salir del Club Lazer, luego del incidente, había policías afuera.[23]

Una vez culminó el desfile de prueba de la parte demandante,[24] el Club Lazer presentó una moción de desestimación al amparo de la Regla 39.2(c) de Procedimiento Civil, 32 LPRA Ap. V, que provee para la solicitud de desestimación de un pleito por insuficiencia de prueba o *non-suit*. Dicha solicitud fue declarada ha lugar por el Tribunal de Primera Instancia.

Insatisfecha con dicha determinación, la señora Camacho Rivera acudió al Tribunal de Apelaciones y, en

---

[22] TPO págs. 54-58.

[23] TPO págs. 58-60.

[24] Es menester señalar que, una vez culminado el desfile de prueba, el Club Lazer solicitó que se aplicara la presunción de testimonio voluntariamente suprimido a tenor con la Regla 304 de las de Evidencia, 32 LPRA Ap. V., respecto a Alexander Rivera Betancourt (en adelante "joven Rivera Betancourt"), quien fuera anunciado como testigo, pero que no compareció. Alegaron que el joven Rivera Betancourt fue depuesto en relación al registro que realizaba la discoteca Club Lazer, y que éste expresó que lo verificaron tanto que "entendía que el "bouncer" era homosexual", para describir el nivel de registro que le hicieron en el lugar. Además, alegadamente testificaría que en el Club Lazer había detectores de metales, que en varias ocasiones lo rebuscaron y testificaría sobre los "bouncers" que había en el establecimiento. Tras la oportuna oposición de la señora Camacho Rivera, y luego de escuchar las argumentaciones respecto a la desestimación por *non suit*, el Tribunal de Primera Instancia emitió un dictamen desestimando la acción, sin atender particularmente la solicitud respecto al testimonio del joven Rivera Betancourt.

síntesis, alegó que el foro primario erró al determinar que procedía desestimar el pleito por insuficiencia de la prueba, y, en consecuencia, al determinar que el Club Lazer no tuvo responsabilidad por los hechos ocurridos. Oportunamente, Club Lazer presentó su alegato en oposición.

Evaluados los planteamientos de ambas partes, el foro apelativo intermedio emitió una *Sentencia* mediante la cual revocó al Tribunal de Primera Instancia. Al así hacerlo, el Tribunal de Apelaciones expresó que la entrada de menores de edad al Club Lazer y la venta de bebidas alcohólicas a éstos, junto al consumo de drogas por parte de los jóvenes y el registro de armas defectuoso, creaban un "*coctel explosivo y peligroso*" para los asistentes del lugar. Siendo ello así, concluyó que, de la prueba que tuvo ante sí el foro primario, éste "*podía hacer una inferencia razonable de negligencia por parte del Club Lazer*".[25] En consecuencia, devolvió el caso al foro primario para que se estimara la responsabilidad civil del Club Lazer a base de la prueba de daños presentada en el juicio.

No obstante, tras una oportuna solicitud de reconsideración presentada por el Club Lazer -- en la que planteó que, por tratarse de una desestimación *non suit,* lo que procedía era que el foro apelativo intermedio devolviera el caso al Tribunal de Primera Instancia para que se continuara con el descubrimiento de prueba -- **el Tribunal de Apelaciones emitió una *Sentencia en Reconsideración* mediante la cual, expresamente, dejó sin**

---

[25] Véase, Apéndice de *Certiorari*, pág. 362.

**efecto la sentencia previa**. En la *Sentencia en Reconsideración* el Tribunal de Apelaciones sentenció que los pleitos civiles se resuelven por preponderancia de la prueba y que, "*aunque la prueba presentada [podía] ser suficiente para establecer la responsabilidad civil de los demandados, estos no [habían] tenido la oportunidad de alterar ese balance probatorio con la presentación de su prueba*".[26] Así pues, resolvió que procedía devolver el caso al Tribunal de Primera Instancia para que continuaran los procedimientos con la presentación y refutación de prueba por parte de Club Lazer. El Club Lazer solicitó la revisión de dicha determinación ante este foro, pedido que fue denegado, por lo que la referida Sentencia advino final y firme.

Cumpliendo con lo ordenado, el 22 de noviembre de 2013, se reinició el juicio en su fondo ante otro juez, quien se familiarizó con la prueba desfilada hasta el momento mediante la evaluación del expediente y la regrabación de la vista realizada. Restando por desfilar la prueba del Club Lazer, su única testigo anunciada, la señora Karla Haakensen (en adelante "señora Haakensen"), quien era la gerente del Club Lazer al momento de los hechos, no se presentó al Tribunal ya que no pudo ser citada a pesar de las gestiones realizadas con tal propósito. Ante ello, el Club Lazer solicitó que se admitiera una deposición de la testigo, solicitud que fue denegada por el Tribunal de Primera Instancia. Ello, tras considerar que las gestiones realizadas por el Club Lazer no fueron suficientes para calificarla como testigo no

---

[26] Véase, Apéndice de *Certiorari*, pág. 407.

disponible a tenor con la Regla 806 (B)(1) de evidencia, 32 LPRA Ap. V, R. 806 (B)(1). Así pues, aplicó la presunción dispuesta en la Regla 304 (5) de las Reglas de Evidencia, *supra*, sobre el testimonio voluntariamente suprimido.

Así las cosas, tras evaluar toda la prueba testifical y documental ante sí, el Tribunal de Primera Instancia concluyó que el Club Lazer era responsable por los daños sufridos por la señora Camacho Rivera y sus hijos, tras la muerte del joven Cotto Camacho. Dicha determinación fue oportunamente notificada a todas las partes en el litigio.

Insatisfechas con tal determinación, ambas partes acudieron al Tribunal de Apelaciones. Por un lado, la señora Camacho Rivera cuestionó las cuantías concedidas por concepto de daños y perjuicios, y la procedencia de honorarios de abogado por temeridad. El Club Lazer, por su parte, señaló que el foro primario erró al imponerle responsabilidad por los daños sufridos por la señora Camacho Rivera en ausencia de negligencia de su parte, y al no permitir que se presentara la trascripción de la deposición de la testigo señora Haakensen.

Examinados los alegatos presentados por ambas partes, el foro apelativo intermedio decidió consolidar ambos recursos para así disponer de ellos. Consolidados los recursos, emitió una *Sentencia* mediante la cual revocó el dictamen del foro recurrido, por entender que el mismo no estaba fundamentado en la evidencia desfilada, sino en presunciones de hechos no demostrados e inferencias fundamentadas en la especulación. Además,

por no haberse demostrado, a tenor con lo dispuesto en nuestro ordenamiento, la previsibilidad de los hechos ocurridos en el establecimiento. En particular, concluyó que la prueba desfilada no demostraba la existencia de actividad criminal alguna que se estuviera llevando a cabo en el Club Lazer previo a la noche de los hechos, ni alguna actividad criminal anterior en el local o en sus inmediaciones que exigieran un nivel de seguridad particular mayor al provisto la noche de los hechos, según lo requiere la jurisprudencia aplicable.

No conforme con dicha determinación, la señora Camacho Rivera acudió ante nos y solicitó la revisión del dictamen emitido por el Tribunal de Apelaciones. En esencia, argumentó que el foro apelativo intermedio erró al determinar que el Club Lazer no fue negligente, al no concederle el aumento de la indemnización en las partidas concedidas y al revocar la sentencia del foro primario. Además, alegó que la determinación recurrida es contraria a la *Sentencia en Reconsideración* emitida por el Tribunal de Apelaciones (con relación a la desestimación por insuficiencia de prueba), la cual constituía la ley del caso. Oportunamente, el Club Lazer presentó su alegato en oposición.

Trabadas así las controversias, y contando con el beneficio de la comparecencia de ambas partes, una mayoría de este Tribunal al revocar al Tribunal de Apelaciones e imponerle responsabilidad al Club Lazer por la lamentable muerte ocurrida en sus inmediaciones, opta por reinterpretar lo resuelto en *J.A.D.M. v. Centro Com. Plaza Carolina, infra,* -- esta vez desarrollando una

interpretación acomodaticia del análisis de la totalidad de las circunstancias. Como ya mencionamos, de ese lamentable proceder, enérgicamente disentimos. Explicamos por qué.

II.

A.

Como es sabido, el Art. 1802 del Código Civil de Puerto Rico, 31 LPRA sec. 5141, claramente establece que quien ocasione daño por culpa o negligencia está obligado a reparar el daño causado. *Santiago Montañez v. Fresenius Medical*, 195 DPR 476 (2016); *Rodríguez et al. v. Hospital et al.*, 186 DPR 889 (2012); *Sagardía de Jesús v. Hosp. Aux. Mutuo,* 177 DPR 484 (2009). En esa dirección, en el pasado, hemos expresado que para que prospere una reclamación en daños y perjuicios al amparo del Art. 1802 del Código Civil, *supra*, deben concurrir los siguientes elementos*:* (1) el acto u omisión culposo o negligente; (2) la relación causal entre el acto u omisión culposo o negligente y el daño ocasionado; y (3) el daño real causado al reclamante. *Nieves Díaz v. González Massas,* 178 DPR 820, 843 (2010). *Véanse*, además, *Weber Carrillo v. E.L.A.,* 190 DPR 688 (2014); *López v. Porrata Doria*, 169 DPR 135 (2006).

En cuanto al elemento de culpa o negligencia, necesario para que prospere esta causa de acción, lo hemos definido como falta del debido cuidado, esto es, no anticipar ni prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en tales circunstancias. *Siaca v. Bahía Beach Resort*, 194 DPR 559, 605 (2016); *Colón*

*Pérez v. Televicentro*, 175 DPR 690 (2009); *Toro Aponte v. E.L.A.*, 142 DPR 464 (1997). También hemos sostenido que la culpa es la omisión de la diligencia exigible, mediante cuyo empleo pudo haberse evitado el resultado dañoso. *López v. Porrata Doria, supra; Valle v. E.L.A.*, 157 DPR 1 (2002); *Montalvo v. Cruz, 144 DPR 748 (1998)*. A su vez, la diligencia exigible es la que cabe esperar del ser humano promedio o la persona razonable, que la doctrina llama el buen *pater familias. Valle v. E.L.A., supra; Montalvo v. Cruz, supra*, pág. 756; *Jiménez v. Pelegrina Espinet,* 112 DPR 700 (1982); *Ramos v. Carlo*, 85 DPR 353 (1962).

Así pues, y cónsono con lo anterior, hemos establecido también que un elemento esencial de la responsabilidad civil extracontractual es el factor de la previsibilidad. *Nieves Díaz v. González Massas, supra*, pág. 844; *Pons v. Engebretson*, 160 DPR 347 (2003); *Monllor v. Soc. de Gananciales*, 138 DPR 600 (1995). Para determinar si el resultado del acto negligente es razonablemente previsible, es preciso acudir a la figura del hombre prudente y razonable, también conocida como el buen padre de familia. Éste es aquella persona que actúa con el grado de cuidado, diligencia, vigilancia y precaución que exigen las circunstancias. *Nieves Díaz v. González Massas, supra*, pág. 844; *Pons v. Engebretson, supra; Monllor v. Soc. de Gananciales, supra*. Si el daño es previsible por éste, hay responsabilidad; si no es previsible, estamos generalmente en presencia de un caso fortuito. *Valle v. E.L.A., supra; Montalvo v. Cruz, supra*, pág. 756; *Toro Aponte v. E.L.A., supra*.

En ese sentido, es menester señalar que el deber de anticipar y prever los daños no se extiende a todo riesgo posible. *López v. Dr. Canizares*, 163 DPR 119 (2004); *Montalvo v. Cruz*, *supra*. "Lo esencial es que se tenga el deber de prever en forma general consecuencias de determinada clase". *Santiago v. Sup. Grande*, 166 DPR 796, 808 (2006); *Montalvo v. Cruz*, *supra*; *J.A.D.M. v. Centro Com. Plaza Carolina*, 132 DPR 785 (1993); *Ginés Meléndez v. Autoridad de Acueductos*, 86 DPR 518, 524 (1962).

Por último, y como se sabe, otro elemento necesario para que prospere una causa de acción por daños y perjuicios extracontractuales, es aquel que se conoce como causalidad adecuada. Esto es

> la relación entre el daño y su autor, que a su vez indica "¿cuál sería la causa próxima del accidente?" *Negrón García v. Noriega Ortiz*, 117 D.P.R. 570, 575 (1986). **De este modo, un daño podrá considerarse como el resultado probable y natural de un acto u omisión negligente, *si luego del suceso —mirándolo retrospectivamente— éste parece ser la consecuencia razonable y común de la acción u omisión de que se trate.*** (Énfasis suplido). *Santiago v. Sup. Grande, supra, pág. 818. Véanse*, además, *Administrador v. ANR*, 163 DPR 48, 61 (2004); *Montalvo v. Cruz*, *supra*.

Así pues, para que proceda una acción en daños deberá existir una relación causal suficiente en derecho entre el acto negligente y los daños producidos. "[N]o es causa toda condición sin la cual no se hubiera producido el resultado, sino aquella que ordinariamente lo produce, según la experiencia general". *López v. Porrata Doria*, *supra*, pág. 133; *López v. Dr. Canizares*, *supra*; *Sociedad de Gananciales* v. Jerónimo Corp., 103 DPR 127 (1974). Dicho de otro modo, "causa es la condición que ordinariamente produce el daño, según la experiencia

general, y este nexo causal puede romperse ante la ocurrencia de un acto extraño". *López v. Porrata Doria, supra,* pág. 152; *Elba A.B.M. v. U.P.R.*, 125 DPR 294, 310 (1990).

### B.

Ahora bien, por considerarlo en extremo pertinente para la adecuada disposición de la controversia que nos ocupa, sobre el alcance de la responsabilidad extracontractual de establecimientos comerciales, conviene recordar que, en reiteradas ocasiones, hemos señalado que éstos últimos tienen una relación particular con sus clientes, "*que los obliga a ofrecerles un grado de seguridad adecuado y razonable que procure garantizar su bienestar*". *Santiago v. Sup. Grande, supra,* pág. 809. *Véanse, Elba A.B.M. v. UPR, supra; J.A.D.M. v. Centro Com. Plaza Carolina, supra; Pabón Escabí v. Axtmayer*, 90 DPR 20 (1964); *Hernández v. La Capital*, 81 DPR 1031 (1960).

No obstante, al evaluar la responsabilidad extracontractual que surge por daños causados por actos criminales de terceros dentro de los establecimientos comerciales, hemos determinado que, "**[c]omo norma general, no existe un deber de proteger a otras personas de actos criminales de terceros**". (Énfasis suplido). *SLG Colón Rivas v. E.L.A.*, 196 DPR 855, 867 (2016); *Santiago v. Sup. Grande, supra,* pág. 809. **Ahora bien, a modo de excepción, hemos resuelto que existen situaciones en las que, en atención a las características particulares de ciertas instituciones y de los servicios que éstas proveen, un demandado puede responder por esos actos.**

(Énfasis suplido). *SLG Colón Rivas v. E.L.A.*, *supra*; *Santiago v. Sup. Grande*, *supra*. **En particular, puede existir responsabilidad "sólo si el demandado es negligente en no tomar precauciones contra el posible criminal;** *esto es, si el riesgo previsible es de dimensión irrazonable comparado con el peso de tomarlas".* (Énfasis suplido). *Santiago v. Sup. Grande, supra, pág. 819; Estremera v. Inmobiliria Rac. Inc., 109 DPR 852, 858 (1980).*

**En el caso de los establecimientos comerciales, éstos tienen el deber de proveer seguridad a sus visitantes cuando "el propietario del establecimiento tiene, o debe tener, conocimiento de que han ocurrido actos delictivos previos en el área bajo su dominio y control, o de que existen circunstancias que hagan que una persona prudente y razonable pueda anticipar la ocurrencia de tales actos".**[27] (Énfasis suplido). *Santiago v. Sup. Grande, supra*, págs. 814-815; *J.A.D.M. v. Centro Com. Plaza Carolina, supra.*[28] Al respecto, hemos

---

[27] Sobre la responsabilidad de los establecimientos comerciales ante actos delictivos de terceros, citamos, a manera de ejemplo, la norma establecida en otras jurisdicciones: "In this approach, foreseeability, and thus liability, is limited to situations where the business owner is aware of the imminent probability of specific harm to its customer." *Boren v. Worthen Nat. Bank of Arkansas,* 921 S.W.2d, pág. 940 (1996). "[T]here will be no duty *upon business owners to guard against criminal acts of a third party unless they 'know or have reason to know that acts are occurring or about to occur on the premises that pose imminent probability of harm to an invitee.'"* Boren, 921 S.W.2d, pag. 940 (citando a *Page v. American Nat'l Bank & Trust Co.,* 850 S.W.2d 133 (Tenn.App. 1991)); *Willmon v. Wal-Mart Stores, Inc.,* 957 F. Supp. 1074, 1077 (E.D. Ark. 1997).

[28] Para llegar a esa determinación, y al momento de imponer responsabilidad de los establecimientos comerciales por los actos de terceros o de animales, hemos acudido a la doctrina federal que dispone lo siguiente:

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the

expresado que "no existe fundamento alguno que apoye una diferenciación entre los centros comerciales regionales y otros establecimientos comerciales a la hora de imponer responsabilidad. El factor del tamaño y de la clasificación del establecimiento no debe ser determinante en el análisis de responsabilidad". *Santiago v. Sup. Grande, supra,* pág. 811. Esta normativa les requiere a todos los propietarios que operan en negocios abiertos al público el emplear un nivel de **cuidado razonable** para proteger a sus clientes, incluyendo contra actos criminales de terceros.[29] *Íd.* D.B. Dobbs, *The Law of Torts*, West Group, 2001, Vol. 2, Sec. 324, pág. 876.

---

accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
(a) discover that such acts are being done or are likely to be done, or
(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it. 2 *Restatement of the Law (Second) of Torts* Sec. 344 (1965). *Santiago v. Sup. Grande*, *supra*, pág. 814; *J.A.D.M. et al. v. Centro Com. Plaza Carolina*, 132 DPR 785, 797 (1993).

Cónsono con lo anterior, para determinar si existe o no un deber de vigilar las instalaciones del establecimiento comercial, debemos considerar lo siguiente:

*f. Duty to police premises.* Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he reasonably anticipates careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection. Restatement of the Law (Second) of Torts, supra, Sec. 344(f*). Santiago v. Sup. Grande*, *supra*, pág. 814.

[29] "The rule today is usually generalized to include *all landowners who open their land to the public for* business and to require them to use reasonable care even to protect against criminal acts of third persons." D.B. Dobbs, *The Law of Torts*, West Group, 2001, Vol. 2, Sec. 324, pág. 876.

Se entiende como cuidado razonable, el deber que tiene todo propietario de un establecimiento comercial de ejercer medidas de seguridad razonables para la protección de sus visitantes. *Colón y otros v. K-Mart y otros,* 154 DPR 510, 518-519 (2001); *Goose v. Hilton Hotels International, Inc.,* 79 DPR 523, 528 (1956). En algunas ocasiones, un aviso es suficiente para que el visitante evite el daño. En otras ocasiones, éste tiene que realizar un ejercicio cuidado razonable de acuerdo a los medios de protección que estén disponibles. Véase, 2 *Restatement of the Law (Second) of Torts* Sec. 344 (1965).[30] Véanse, además, *Schwartzman v. Lloyd*, 65 App.D.C. 216, 82 F.2d 822 (1936); *Champlin Hardware Co. v. Clevinger*, 158 Okla. 10, 12 P.2d 683 (1932); *Terre Haute, Indianapolis & Eastern Traction Co. v. Scott*, 91 Ind. App. 690, 170 N.E. 341, 172 N.E. 659 (1930); *Chicago, T.H. & S.E.R. Co. v. Fisher*, 61 Ind. App. 10, 110 N.E. 240 (1915).

Sobre el particular, *esta Curia ha enfatizado que el determinar la adecuacidad de las medidas de seguridad tomadas por el establecimiento "dependerá de una evaluación de la totalidad de las circunstancias, caso a caso.* Después de todo, el grado de cuidado que debe tener

---

[30] "*Reasonable care.* A public utility or other possessor of land who holds it open to the public for entry for his business purposes is not an insurer of the safety of such visitors against the acts of third persons, or the acts of animals. He is, however, under a duty to exercise reasonable care to give them protection. In many cases a warning is sufficient care if the possessor reasonably believes that it will be enough to enable the visitor to avoid the harm, or protect himself against it. There are, however, many situations in which the possessor cannot reasonably assume that a warning will be sufficient. **He is then required to exercise reasonable care to use such means of protection as are available, or to provide such means in advance because of the likelihood that third persons, or animals, may conduct themselves in a manner which will endanger the safety of the visitor**". (Énfasis suplido). 2 *Restatement of the Law (Second) of Torts* Sec. 344 (1965).

un propietario de un establecimiento comercial variará de acuerdo con la naturaleza del negocio y de sus instalaciones". *Santiago v. Sup. Grande*, *supra*, pág. 812. **Al examinar la totalidad de las circunstancias, se exige analizar en conjunto, (1) la naturaleza del establecimiento comercial y de las actividades que allí se llevan a cabo; (2) la naturaleza de la actividad criminal que se ha registrado y se registra en las instalaciones y en el área donde está ubicado el establecimiento, y (3) las medidas de seguridad existentes en éste**. *Íd.*, pág. 812; *J.A.D.M. v. Centro Com. Plaza Carolina*, *supra*.

III.

De otra parte, y para disponer correctamente de los asuntos ante nuestra consideración, es menester señalar también que, en nuestro ordenamiento jurídico, los derechos y las obligaciones que son adjudicados mediante un dictamen judicial que adviene final y firme, constituyen la ley del caso. *Cacho Pérez v. Hatton Gotay*, 195 DPR 1 (2016); *Félix v. Las Haciendas*, 165 DPR 832 (2005); *Mgmt. Adm. Servs. Corp. v. E.L.A.*, 152 DPR 599 (2000). Esto quiere decir que, como norma general, los planteamientos que han sido objeto de adjudicación no pueden reexaminarse. *Cacho Pérez v. Hatton Gotay*, *supra*; *Félix v. Las Haciendas*, *supra*; *Mgmt. Adm. Servs. Corp. v. E.L.A.*, *supra*. Ello, pues los hechos y derechos adjudicados gozan de las características de finalidad y firmeza con arreglo a la doctrina de la "*ley del caso*". *Cacho Pérez v. Hatton Gotay*, *supra*; *Mgmt. Adm. Servs. Corp. v. E.L.A*, *supra*; *Vélez v. Servicios Legales de*

*P.R.*, 144 DPR 673 (1998). El propósito de esta doctrina es que las partes en un litigio puedan, en lo posible, conducirse en el pleito basados en unas directrices judiciales confiables y certeras. *Cacho Pérez v. Hatton Gotay, supra; Mgmt. Adm. Servs, Corp. v. E.L.A., supra; Sociedad Legal de Gananciales v. Pauneto Rivera*, 130 DPR 749 (1992).

Al disponer qué determinaciones constituyen la ley del caso, hemos expresado que son "todas aquellas cuestiones finales consideradas y decididas por el tribunal". *Félix v. Las Haciendas, supra*, pág. 843. Esas determinaciones, como regla general, obligan tanto al tribunal de instancia como al foro apelativo que las haya dictado, si el caso vuelve ante su consideración. *Íd*. Así pues, la doctrina sólo puede invocarse cuando exista una decisión final de la controversia en sus méritos. *Íd*. Véase, además, *Mgmt. Adm. Servs, Corp. v. E.L.A., supra*.

Ahora bien, si la determinación en cuestión es errónea y puede causar una grave injusticia, el Tribunal puede aplicar una norma de derecho diferente a fin de resolver en forma justa. *Íd*. Así pues, la decisión del caso es descartable si conduce a resultados manifiestamente injustos. *Mgmt. Adm. Servs. Corp. v. E.L.A; supra; Doral Mortgage Corp. v. Alicea*, 147 DPR 862 (1999); *Secretario del Trabajo v. Tribunal Superior*, 95 DPR 136, 140 (1967); *Estado Libre Asociado de P.R. v. The Ocean Park Development Corp.*, 79 DPR 158 (1956).

Es, precisamente, a la luz de la normativa antes expuesta, -- y no a la luz de la errada reinterpretación que hoy hace una mayoría de este Tribunal de lo resuelto

en *J.A.D.M. v. Centro Com. Plaza Carolina, supra,* mediante la cual se formula una interpretación acomodaticia del análisis de la totalidad de las circunstancias para cuando se atiendan casos como el de autos -- que procedía disponer de las controversias que nos ocupan. Como una mayoría de esta Curia no lo hizo así, a través de esta Opinión Disidente procedemos a así hacerlo.

IV.

De entrada, y para disponer correctamente de los asuntos ante nuestra consideración, en el presente caso, es menester resolver, en primer lugar, el segundo señalamiento de error presentado por la señora Camacho Rivera, en el que se alega que la determinación emitida por el Tribunal de Apelaciones es errónea por ser contraria a la ley del caso. Ésta arguye que la determinación del foro apelativo intermedio al momento de examinar la procedencia de una moción de desestimación al amparo de la Regla 39.2(c) de Procedimiento Civil, 32 LPRA Ap. V, imponía responsabilidad al Club Lazer, disponiendo así del presente litigio. No le asiste la razón.

Y es que, si bien al momento de considerar la moción de desestimación al amparo de la Regla 39.2 de las de Procedimiento Civil, *supra*, el foro apelativo realizó expresiones respecto a la apreciación de la prueba desfilada hasta ese momento y su inferencia de responsabilidad por parte del Club Lazer, las mismas resultaron en un "dictum" toda vez que dicho foro resolvió -- en reconsideración -- devolver el caso al

Tribunal de Primera Instancia para que continuaran los procedimientos con el fin de determinar si el Club Lazer había sido negligente al alegadamente no tomar las medidas de seguridad necesarias para evitar la entrada de personas armadas a sus predios, lo que ocasionó la muerte del joven Cotto Camacho. Es decir, la controversia respecto a la negligencia de Club Lazer no había sido adjudicada finalmente por el Tribunal de Apelaciones, por lo que no se puede invocar aquí la doctrina de ley del caso. Siendo ello así, no se cometió el error señalado por la señora Camacho Rivera.

Establecido lo anterior, pasamos a atender el señalamiento de error relacionado a la alegada negligencia por parte del Club Lazer. Como ya mencionamos, en el caso ante nuestra consideración, el joven Cotto Camacho, de 19 años de edad, acudió al Club Lazer en horas de la noche del 29 de septiembre de 2008. Esa noche, se suscitó un altercado en el que éste resultó herido de bala, falleciendo siete (7) días después como consecuencia del disparo recibido en la cabeza. Así las cosas, la señora Camacho Rivera, por sí y en representación de sus hijos, presentó una demanda de daños y perjuicios contra el Club Lazer, en la que alegó que éste fue negligente al permitir el consumo de bebidas alcohólicas y drogas por menores de edad, y permitir que ingresara un arma de fuego al establecimiento, lo que, a su juicio, ocasionó la muerte del joven Cotto Camacho, quien fue asesinado por un tercero en el referido establecimiento comercial.

Como sabemos, y según ha quedado claramente establecido, al momento de imponer responsabilidad a un establecimiento comercial por actos criminales de terceros, conforme a la normativa debemos evaluar a la luz de la totalidad de las circunstancias (1) la naturaleza del establecimiento comercial y de las actividades que allí se llevan a cabo; (2) la naturaleza de la actividad criminal que se ha registrado y se registra en las instalaciones y en el área donde está ubicado el establecimiento, y (3) las medidas de seguridad existentes en éste. Procedemos, pues, a así hacerlo.

Según se desprende de la prueba desfilada ante el Tribunal de Primera Instancia, y tal como ha quedado claramente establecido, el Club Lazer era un local con horario nocturno al que las personas asistían con el fin de escuchar música, bailar, interactuar con otras personas y consumir bebidas alcohólicas. De su faz, y contrario a lo interpretado por una mayoría de este Tribunal, dicho establecimiento comercial no tenía una naturaleza inherentemente peligrosa para la sociedad. **Del expediente que obra en nuestro poder, no se desprende que en el juicio celebrado ante el Tribunal de Primera Instancia se haya desfilado prueba en contrario o prueba alguna sobre actividad criminal previa registrada en el lugar donde operaba el establecimiento.**

Recordemos que, conforme a la normativa que gobierna estos asuntos -- entiéndase lo correctamente resuelto hace más de décadas en *J.A.D.M. v. Centro Com. Plaza Carolina,* y reiterado en *Santiago v. Sup. Grande, supra* -

-, al momento de evaluar la razonabilidad de las medidas de seguridad tomadas por el establecimiento comercial, como paso previo para imponer daños y perjuicios por incidentes ocasionadas en esos lugares, la doctrina requiere demostrar el conocimiento, por parte de los propietarios del establecimiento comercial, de que habían ocurrido actos delictivos previos en el área bajo su dominio y control, o de que existen circunstancias que hiciesen que una persona prudente y razonable pudiese anticipar la ocurrencia de éstos. **El expediente ante nuestra consideración está huérfano de esa prueba. Es decir, hay ausencia total de la misma.**

Aun así, al evaluar las medidas de seguridad tomadas por el Club Lazer el día de los hechos que dieron lugar a este caso, y según se desprende de los testimonios vertidos durante el juicio, ha quedado claramente demostrado que el establecimiento comercial en cuestión contaba con personal de seguridad o "bouncers" dentro y fuera del establecimiento, así como con la presencia de policías estatales en las afueras del lugar. En esa dirección, precisa señalar también que todos los testigos presentados durante el juicio declararon que fueron sometidos a un registro por parte del personal de seguridad del local. En cuanto a en qué consistía el mismo, uno de los testigos (el joven Barada Santiago) expresó que le revisaron los bolsillos, los zapatos y le pasaron un detector de metales. También le requirieron una tarjeta de identificación para permitirle el acceso. De otra parte, los demás testigos expresaron que los registraron y "rebuscaron" manualmente. Tales medidas,

sin lugar a dudas, resultan en extremo razonables. Máxime, cuando no se demostró la ocurrencia de actividad delictiva previa.

Una mayoría de este Tribunal, a través del dictamen que hoy emite, dice evaluar (1) la naturaleza del establecimiento comercial y de las actividades que allí se llevan a cabo; (2) la naturaleza de la actividad criminal que se ha registrado y se registra en las instalaciones y en el área donde está ubicado el establecimiento, y (3) las medidas de seguridad existentes en éste, **"a la luz de la totalidad de las circunstancias"**. Sin embargo, interpretan erradamente que las medidas de seguridad realizadas por el Club Lazer fueron implementadas de manera inadecuada,[31] dejando a un lado el criterio de la totalidad de las circunstancias y basándose en un solo elemento de juicio para imponer responsabilidad. Incluso, da a entender que no es necesario probar el elemento de existencia o inexistencia de incidentes delictivos[32] en las instalaciones y en el área en donde se localiza el establecimiento para imponer responsabilidad y que la naturaleza de un lugar de entretenimiento nocturno es inherentemente peligrosa.[33]

---

[31] Véase, Opinión mayoritaria, pág. 19.
[32] Véase, Opinión mayoritaria, pág. 21.
[33] Véase, Opinión mayoritaria, págs. 21-22.
En *Colón y otros v. Kmart y otros*, 154 DPR 510 (2001), expresamos en cuanto al cuidado que se les exige a los establecimientos comerciales que:

> **De ningún modo significa ello que el dueño de un establecimiento comercial asume una responsabilidad absoluta frente a cualquier daño sufrido por sus clientes.** *Para que se le imponga responsabilidad, el demandante tiene que probar que el dueño no ejerció el debido cuidado para que el local fuese seguro.* En los casos de accidentes en

En fin, y toda vez que el expediente ante nuestra consideración está huérfano de prueba que tienda a demostrar, como lo exige la normativa que gobierna estos asuntos que a la luz de la totalidad de las circunstancias (1) las actividades que se habían estado llevando a cabo en el Club Lazer previo a la noche de los hechos, (2) o que la actividad criminal anterior en el local o en sus inmediaciones (3) exigieran un nivel de seguridad particular o en cualquier caso mayor al provisto la noche de los hechos, no procede, pues, la reclamación en daños y perjuicios instada por la señora Camacho Rivera. Siendo ello así, a nuestro juicio, no se cometió el error señalado.

V.

Es, pues, por los fundamentos antes expuestos, que disentimos del curso de acción seguido por una mayoría de este Tribunal en el día de hoy.


                                Ángel Colón Pérez
                                Juez Asociado


---

establecimientos comerciales, este Tribunal ha impuesto responsabilidad siempre que el demandante pruebe que existían condiciones peligrosas dentro de las tiendas correspondientes, "las cuales eran de conocimiento de los propietarios o su conocimiento podía imputárseles a éstos". (Énfasis suprimido.) *Cotto v. C.M. Ins. Co.*, supra, pág. 650. En otras palabras, **el demandante tiene que probar que su daño se debió a la existencia de una condición peligrosa, que esa condición fue *la que con mayor probabilidad ocasionó el daño* y que ésta era conocida por el demandado, o que debió conocerla.** (Énfasis suplido). *Admor. F.S.E. v. Almacén Ramón Rosa*, *supra*. *Colon y otros v. K-Mart y otros*, *supra*, págs. 518-19.